UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

YASSINE SOUMAH,

    Plaintiff,

v.

GREGORY COLLETT,
*Director, Baltimore Field Office,
U.S. Citizenship and Immigration Services,*

    Defendant.

Civil Action No. TDC-23-2473

**MEMORANDUM OPINION**

Plaintiff Yassine Soumah has filed a civil action against the Director of the Baltimore Field Office of United States Citizenship and Immigration Services ("USCIS"), in which he seeks judicial review pursuant to 8 U.S.C. § 1421(c) of the agency's denial of his application for naturalization as a United States citizen. USCIS has filed a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6). Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion will be DENIED.

**BACKGROUND**

**I.    Statutory Requirements**

The Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101–1537 (2018), governs the admission of foreign nationals to the United States. The INA grants the "sole authority to naturalize persons as citizens of the United States" to the Attorney General of the United States. 8 U.S.C. § 1421(a). Since the naturalization function was transferred to USCIS, which is a

component agency of the Department of Homeland Security, that authority is now exercised by the Secretary of Homeland Security. *See Yith v. Nielsen*, 881 F.3d 1155, 1158 (9th Cir. 2018) (stating that courts interpret references to the Attorney General in INA provisions addressing authority over naturalization "as referring to the authority of the USCIS"); *Mestanek v. Jaddou*, 93 F.4th 164, 170-71 (4th Cir. 2024) (describing the transfer of the administration of federal immigration laws to USCIS and other components within DHS "under the purview of the [] Secretary of Homeland Security").

As relevant here, the INA sets forth three requirements for naturalization:

No person, except as otherwise provided in this subchapter, shall be naturalized unless such applicant, (1) immediately preceding the date of filing his application for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least five years . . . (2) has resided continuously within the United States from the date of the application up to the time of admission to citizenship, and (3) during all the periods referred to in this subsection has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States.

8 U.S.C. § 1427(a). The INA further states that "[e]xcept as otherwise provided in this subchapter, no person shall be naturalized unless he has been lawfully admitted to the United States for permanent residence in accordance with all applicable provisions of [the INA]." 8 U.S.C. § 1429.

The requirement of lawful admission for permanent residence can be satisfied if the applicant was a refugee, or a spouse or child of a refugee, whose status was adjusted to that of lawful permanent residence. The requirements for such adjustment of status are as follows:

The Secretary of Homeland Security or the Attorney General, in the Secretary's or the Attorney General's discretion and under such regulations as the Secretary or the Attorney General may prescribe, may adjust to the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum who—

(1) applies for such adjustment,

(2) has been physically present in the United States for at least one year after being granted asylum,

(3) continues to be a refugee within the meaning of section 1101(a)(42)(A) of this title or a spouse or child of such a refugee,

(4) is not firmly resettled in any foreign country, and

(5) is admissible (except as otherwise provided under subsection (c)) as an immigrant under this chapter at the time of examination for adjustment of such alien.

8 U.S.C. 1159(b).

## II. Application for Lawful Permanent Residence

Yassine Soumah was born in Tanzania in 1971. He currently resides in Greenbelt, Maryland. On or about October 26, 2001, he married Mariam Diane ("Diane"). At some unspecified time, due to fear of persecution in her home country, Diane applied for asylum in the United States, which was approved. In January 2002, Diane filed a Form I-730, a Refugee/Asylee Relative Petition, on behalf of Soumah. The petition was approved in March 2002, and Soumah was granted asylee status under the INA.

On November 14, 2007, Soumah filed Form I-485, an Application to Register Permanent Residence or Adjust Status. On September 9, 2008, while his Form I-485 had yet to be adjudicated, Soumah and Diane divorced. One year later, on September 9, 2009, Soumah submitted the divorce decree to USCIS. On September 29, 2009, USCIS approved Soumah's Form I-485 application, and Soumah was granted status as a lawful permanent resident.

## III. Application for Naturalization

In February 2017, Soumah applied for naturalization by filing Form N-400, an Application for Naturalization. He appeared for his naturalization interview on August 24, 2017. At the interview, Soumah passed his English proficiency test and the United States history and

government examination. On March 11, 2019, however, in a decision letter signed by Gregory Collett, Director of the USCIS Baltimore Field Office, USCIS denied Soumah's application for naturalization. In the decision letter, USCIS stated that Soumah did not meet the requirement for naturalization that he was lawfully admitted for permanent residence. Noting that Soumah had "obtained [his] permanent resident status as a derivate asylee through [his] ex-spouse," USCIS concluded that the September 9, 2008 divorce terminated Soumah's status as a derivative of Diane, such that he was actually "ineligible to adjust status as a derivative asylee" to that of a permanent resident at the time that his Form I-485 application was approved on September 29, 2009. N-400 Decision at 2, Compl. Ex. 3, ECF No. 1-3.

After the denial of his naturalization application, Soumah filed Form N-336, a Request for a Hearing on a Decision in Naturalization Proceedings. On September 29, 2020, USCIS affirmed the denial of his Form N-400 and denied Soumah's Form N-336 request based on the conclusion that Soumah did not lawfully adjust to permanent resident status because he and Diane were legally divorced before his adjustment of status was granted on September 29, 2009. USCIS also stated that "for adjustment of status purposes, a derivative asylee must continue to meet the definition of a spouse of the principal asylee at the time of filing, and at the time of approval of the adjustment application." N-336 Decision at 2, Compl. Ex. 4, ECF No. 1-4. The decision also advised Soumah that he may request judicial review of this final determination by filing a petition in federal district court.

IV. **Procedural History**

On September 12, 2023, Soumah filed the Complaint in this case in which he requests a *de novo* review of USCIS's denial of his application for naturalization. In the Complaint, Soumah argues that he met all of the requirements for naturalization and that USCIS misinterpreted the law

in finding that he was not lawfully admitted for permanent residence as a derivative asylee. Specifically, Soumah asserts that USCIS erroneously interpreted 8 U.S.C. § 1159(b)(3), which requires an applicant seeking adjustment from refugee or derivative status to the status of a lawful permanent resident to "continue[] to be a refugee . . . or a spouse or child of such a refugee," *id.*, as requiring Soumah to still be married to Diane on the date that his application to adjust status was actually adjudicated and granted, rather than up to the date that he submitted his application. Soumah asserts that because he was married to Diane at the time he filed his Form I-485 in November 2007, he was eligible to receive adjustment of status pursuant to the statute, was lawfully admitted for permanent residence when his application was approved on September 29, 2009, and therefore met all of the requirements for naturalization under the INA.

## DISCUSSION

In the Motion to Dismiss, USCIS argues that the Complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(6) because, as a matter of law, he did not meet the requirements for naturalization. Specifically, USCIS argues that both the text of 8 U.S.C. § 1159(b)(3) and prior agency interpretations require a derivative asylee to meet the definition of a spouse or child of a refugee "both at the time of filing and final adjudication" of the application for adjustment of status. Mot. Dismiss at 6, ECF No. 17-1. Accordingly, USCIS asserts that the denial of Soumah's naturalization application was proper because even though USCIS approved his application to adjust his status to lawful permanent residence in 2009, that grant was "improper" on the grounds that his divorce had terminated his derivative asylee status before his application was adjudicated and thus rendered him ineligible for permanent resident status. *Id.* at 7.

I.      **Legal Standards**

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Under the INA, a person whose application for naturalization is denied "may seek review of such denial before the United States district court for the district in which such person resides in accordance with [5 U.S.C. §§ 701-706]." 8 U.S.C. § 1421(c). The court must review the denial *de novo* and "shall make its own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing *de novo* on the application." *Id.*; *see Dung Phan v. Holder*, 667 F.3d 448, 451 (4th Cir. 2012). "Courts have the power to confer citizenship only 'in strict compliance with the terms of an authorizing statute.'" *Cody v. Caterisano*, 631 F.3d 136, 142 (4th Cir. 2011) (quoting *Immigration & Naturalization Serv. v. Pangilinan*, 486 U.S. 875, 884 (1988)). "[T]he burden is on the . . . applicant to show . . . eligibility for citizenship in every respect." *Id.* (quoting *Berenyi v. Immigration & Naturalization Serv.*, 385 U.S. 630, 637 (1967)).

In his Complaint, Soumah requests a hearing on his application for naturalization "concerning any and all issues the Court deems necessary or appropriate, if necessary." Compl. ¶ 25, ECF No. 1. Because the sole issue before the Court in relation to the Motion to Dismiss is a

question of law, the Court finds that no hearing is necessary to resolve the Motion. *See Chan v. Gantner*, 464 F.3d 289, 295-96 (2d Cir. 2006).

## II.      8 U.S.C. § 1159(b)(3)

The sole issue disputed by the parties is the interpretation of the requirement for adjustment of status to lawful permanent residence that the applicant "continues to be a refugee . . . or a spouse or child of such a refugee." 8 U.S.C. § 1159(b)(3). USCIS argues that the plain language of this statutory provision, as well as prior agency decisions, establishes that in order to satisfy this requirement, an individual who was granted derivative asylum as the spouse of a refugee must still be married to the refugee at the time at which the individual's application to adjust to legal permanent resident status is adjudicated and granted. In contrast, Soumah argues that the statute is properly read to require only that a derivative asylee "continue" to be married to a qualifying refugee as of the date that the application was filed. Opp'n at 5, ECF No. 19.

The parties have not identified, and the Court has not found, any controlling authority on this specific issue, or any opinion by a United States Court of Appeals ruling on this issue. One federal court, however, has addressed this specific question and held that 8 U.S.C. § 1159(b)(3) requires only that the marriage continue up to the date of application, not to the date of adjudication of the application. *Dorbor v. United States*, 379 F. Supp. 3d 765, 769-71 (W.D. Wisc. 2019). In *Dorbor*, James Dorbor, a citizen of Liberia, was married in Liberia in 1987 to Garmai Stubblefield, who then entered in the United States in 2001, applied for and received political asylum, and successfully applied for Dorbor and their children to be admitted as derivative asylees in 2004. *Id.* at 767. Dorbor applied for adjustment of status to lawful permanent residence on May 5, 2006, Dorbor and Stubblefield divorced on October 29, 2007, but USCIS nevertheless adjudicated and granted his application on February 13, 2009. *Id.* However, when Dorbor applied for

naturalization in 2014, he was denied in part on the grounds that his marriage had ended in divorce before he received adjustment of status. *Id.*

In ruling that Dorbor had been eligible for adjustment of status to lawful permanent residence because he continued to be married to Stubblefield at the time of his application, the court considered the text of 8 U.S.C. § 1159(b)(3) and found that while it does not "expressly state how long an applicant must 'continue' to be a refugee or child of a refugee," reading § 1159(b) "as a whole" supported Dorbor's position, because where § 1159(b)(2) describes a requirement that the applicant "has been physically present in the United States for at least one year after being granted asylum," the "most natural reading" of the immediately following § 1159(b)(3) is that the applicant must continue to be a refugee or a spouse of a refugee throughout that one year after being granted refugee or asylee status. *Dorbor*, 379 F. Supp. 3d at 769. The court also noted that the language in § 1159(b)(1) requiring that the applicant "applies for such adjustment," in the present tense, suggests that the relevant point in time is that of the filing of the application. *Id.* at 770. It further relied on the fact that § 1159(b)(5) expressly stated that the additional requirement that the applicant be "admissible . . . as an immigrant" was to be assessed "at the time of examination for adjustment," which demonstrated that Congress would include such language "when it wanted the agency to consider events that occurred after the filing of the application," and reasoned that the omission of that language from § 1159(b)(3) demonstrates that it did not apply that condition to the requirement of continuing to be the spouse of a refugee. *Id.*

Finally, the court relied on two United States Court of Appeals cases, *Choin v. Mukasey*, 537 F.3d 1116 (9th Cir. 2008), and *Carpio v. Holder*, 592 F.3d 1091 (10th Cir. 2010), interpreting a similar provision in 8 U.S.C. § 1255(d), which permits certain individuals to seek permanent residence if they are in the United States "as a result of the marriage of the nonimmigrant" to a

citizen. *Id.* at 771. The court noted that *Choin* rejected the argument that whether the applicant was married to a citizen was to be assessed as of the date of adjudication, and that *Carpio* rejected the same argument as to the issue of whether a child was still a "minor child" of such an applicant, in part because applying the date of adjudication would "lead to arbitrary decisions" based on when USCIS happens to adjudicate the application, and applicants "should not be penalized because of changes that occur 'while their application for adjustment of status languishes in the agency's file cabinet.'" *Dorbor*, 379 F. Supp. 3d at 771 (quoting *Choin*, 537 F.3d at 1121); *see also Carpio*, 592 F.3d at 1102 (quoting *Choin*, 537 F.3d at 1121). Based on its analysis, the court found that Dorbor was properly granted adjustment of status because he remained married at the time of application, and it ordered USCIS to approve his application for naturalization. *Id.* at 771-72.

As the Court conducts its own analysis of the issue, it finds the reasoning of *Dorbor* persuasive. "When interpreting a statute, we begin with the plain language." *Hately v. Watts*, 917 F.3d 770, 784 (4th Cir. 2019) (quoting *In re Total Realty Mgmt., LLC*, 706 F.3d 245, 251 (4th Cir. 2013)). "To determine a statute's plain meaning, we not only look to the language itself, but also the specific context in which the language is used, and the broader context of the statute as a whole." *Id.* (quoting *In re Total Realty Mgmt., LLC*, 706 F.3d at 251). The Court finds that the text of § 1159(b)(3) does not specifically state how long an individual seeking to adjust status to lawful permanent residence must "continue[] to be" the spouse of the qualifying refugee. 8 U.S.C. § 1159(b)(3). Although USCIS argues that this provision should be read to require that the marriage continue up to the date of adjudication of the application, the language does not preclude Soumah's reading that the marital status must continue only until the application for adjustment of status is filed. Notably, consideration of § 1159(b) as a whole supports Soumah's reading. *See*

*Schilling v. Schmidt Baking Co., Inc*, 876 F.3d 596, 601-02 (4th Cir. 2017) (in interpreting a federal statute, considering the interplay of the various subsections based on the principle that the analysis is "informed by the specific context in which the language is used, and the broader context of the statute as a whole"). While the court agrees with and adopts the reasoning of *Dorbor* in relation to the significance of the language in § 1159(b)(1) and (b)(2), *see Dorbor*, 379 F. Supp. 3d at 769-70, it finds most compelling the contrast between the language of § 1159(b)(3), which does not specifically address the timing issue, and § 1159(b)(5), which includes as a requirement for adjustment of status to permanent residence that the applicant "is admissible (except as otherwise provided under subsection (c)) as an immigrant under this chapter at the time of examination for adjustment of such alien." 8 U.S.C. § 1159(b)(5).

As drafted, the clarifying language "at the time of examination for adjustment of such alien," which appears only within the separately numbered subsection, applies only to § 1159(b)(5) and cannot fairly be read to apply to § 1159(b)(3) or any of the other requirements for adjustment of status. *See United States v. Naftalin*, 441 U.S. 768, 773-774, 774 n.5 (1979) (in interpreting a federal statute, declining to read an express requirement in the third and final subsection as also applying to the first and second subsections where there was "use of separate numbers to introduce each subsection" and the additional requirement "was set off solely as part of subsection (3)"). The fact that Congress included such language in § 1159(b)(5) demonstrates that it knew how to and would add such language when it intended to require the described condition to exist at the time of adjudication, such that the failure to include language such as "at the time of examination for adjustment" in § 1159(b)(3) provides significant support for the argument that Congress did not intend to require an applicant to continue to be the spouse or child of a qualifying refugee up to and including the date of adjudication. *See Dorbor*, 379 F. Supp. 3d at 770. Though USCIS

argues that the presence of the additional language in § 1159(b)(5) is warranted by the inclusion of the parenthetical "(except as otherwise provided under subsection (c))," that language merely provided grounds for waiver of the admissibility requirement and in no way explains why the qualifier "at the time of examination for adjustment" needed to be included in § 1159(b)(5) but not in § 1159(b)(3). Reply at 3-4, ECF No. 24. The Court therefore finds that Soumah's reading of the statutory text is the correct one. *See Dorbor*, 379 F. Supp. 3d at 771.

Further, the Court must also apply the principle that courts "are to avoid 'interpretations of a statute which would produce absurd results . . . if alternative interpretations consistent with the legislative purpose are available." *Lara-Aguilar v. Sessions*, 889 F.3d 134, 144 (4th Cir. 2018) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982)). Under USCIS's interpretation, reading into the statute a requirement that an individual such as Soumah must continue to be married to the qualifying refugee up until the date of adjudication would lead to the arbitrary result that the applicant's eligibility for permanent resident status can turn on how long the agency delays in adjudicating the application. Under similar provisions of the INA, courts have rejected a requirement that the status remain in effect as of the time of adjudication in part because such an interpretation produces unreasonable or arbitrary results.

In *Choin*, the court considered whether an application for adjustment of status to lawful permanent residence pursuant to 8 U.S.C. § 1255(d), which required that the non-citizen was admitted to the United States "as a result of the marriage" to a United States citizen, was properly denied where the non-citizen wife and her citizen husband divorced nearly two years after the application was filed but before it was adjudicated. *Choin*, 537 F.3d at 1119. Rejecting the ruling of the Board of Immigration Appeals ("BIA") that the applicant was statutorily ineligible because of the divorce, the court determined that, after an application for adjustment is submitted, divorce

11

was analogous to the death of the citizen spouse, in that "an application that was valid when submitted" should not be rendered "automatically invalid when the petitioner's marriage ends by divorce . . . while [the] application for adjustment of status languishes in the agency's file cabinet." *Id.* at 1121; *see Dorbor*, 379 F. Supp. 3d at 771. Likewise, in *Carpio*, the court reversed the BIA's determination that the son of a non-citizen admitted to the United States as a result of the marriage of his mother to a U.S. citizen was ineligible to adjust status to lawful conditional permanent residence under 8 U.S.C. § 1255(d) because he had turned 21 years of age and thus was no longer a "minor child" when the application was finally adjudicated by USCIS. *Carpio*, 592 F.3d at 1092-94 (finding that the applicant's age should be determined as of the time "when he or she seeks to enter the United States"). The court's ruling was based in part on its conclusion that the BIA's interpretation requiring the applicant to be a minor at the time of adjudication "violates basic principles of common sense and fairness" where an individual who "applied for an adjustment of status several years before his or her twenty-first birthday would have no way of knowing whether the entire lengthy process might prove futile" based on a delayed adjudication by USCIS. *Id.* at 1102; *see Dorbor*, 379 F. Supp. 3d at 771.

Similarly, in *Lockhart v. Napolitano*, 573 F.3d 251, 260 (6th Cir. 2009), the court considered whether USCIS properly rejected a non-citizen spouse's application for adjustment of status to lawful permanent residence under 8 U.S.C. § 1255(a) where her citizen husband had died before the application was adjudicated such that she was no longer an "immediate relative" of a United States citizen as defined in 8 U.S.C. § 1151(b)(2)(A)(i) at the time of adjudication, and before they had been married for a two-year period, which would have triggered a separate right to self-petition. *Id.* at 255-56. After separately concluding that Congress intended that the term "immediate relative" included a widowed spouse, *id.* at 257-60, the court rejected the argument

that the citizen spouse had to be alive at the time of the adjudication in part because "[we] must assume that . . . Congress did not intend an absurd or manifestly unjust result." *Id.* at 260. The court found that such an interpretation "creates an arbitrary, irrational and inequitable outcome in which approvable petitions will be treated differently depending solely upon when the government grants the approval." *Id.* (quoting *Robinson v. Napolitano*, 554 F.3d 358, 371 (3d Cir. 2009) (Nygaard, J., dissenting)). Likewise, in *Robledo v. Chertoff*, 658 F. Supp. 2d 688 (D. Md. 2009), in addressing the same issue and reaching the same conclusion as in *Lockhart*, the court held that "determining an alien spouse's qualification for adjustment of status at the time of adjudication will result in finding that Congress intended the absurd and arbitrary result that 'an alien spouse [married for only a short period but] who experienced a quick adjudication . . . to be completely insulated from termination of her permanent resident status' while at the same time automatically denying permanent status to an alien, whose citizen spouse died . . . solely because her forms where not processed as quickly." *Id.* at 698-99.

While the language of the provisions at issue in those cases differs from that of 8 U.S.C. § 1159(b)(3), the Court finds that USCIS's interpretation requiring the marriage to continue up to the date of adjudication leads to a similarly arbitrary result, under which an individual who filed a Form I-485, with all other requirements under § 1159(b) met, is rendered ineligible to adjust status to lawful permanent residence because the agency delayed the adjudication of the application until after a divorce, while a similar individual who may have been divorced earlier would receive permanent resident status if that individual's application was adjudicated promptly. Indeed, under USCIS's interpretation, an individual married to a refugee as of the date of the filing of an application for adjustment of status, whose refugee spouse then died a year after that filing, would have been eligible for permanent resident status if USCIS had adjudicated the application within

a year of its filing, but would have been rendered ineligible if USCIS had delayed to the point of adjudicating the application more than a year after the filing.

Notably, at the time that Soumah filed his Form I-485 application on November 14, 2007, he had been married to Diane for six years, he remained married to her for almost another year while the application was pending, and he actually notified USCIS of his divorce. In total, the application remained pending for almost two years before it was adjudicated and granted on September 29, 2009. Pursuant to its decision on Soumah's application for naturalization 10 years later, USCIS has now effectively determined that Soumah not only is ineligible for naturalization, but also does not have status as a lawful permanent resident. Where under USCIS's interpretation, the difference between whether Soumah is a United States citizen or an individual with no permanent lawful status over 20 years after entering the United States turns on the particular date when USCIS chose to adjudicate his Form I-485 application, the Court finds that it leads to an arbitrary and absurd result and is thus an unreasonable reading of the statute. The Court therefore finds that the only reasonable reading of 8 U.S.C. § 1159(b)(3) is that the element of a continuous marriage requires only that it continue until the date of application.

### III.    Agency Interpretations

USCIS's citations to an agency regulation and various opinions of the BIA do not alter this conclusion. Generally, a court affords deference pursuant to *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.* ("*Chevron*"), 467 U.S. 837 (1984), "when 'an agency's interpretation is rendered in the exercise of its authority to make rules carrying the force of law.'" *Amaya v. Rosen*, 986 F.3d 424, 430 (4th Cir. 2021) (quoting *Martinez v. Holder*, 740 F.3d 902, 909 (4th Cir. 2006)). Under such circumstances, if the court finds that a statute is silent or ambiguous on the issue, it should defer to the agency's interpretation if is a "reasonable

interpretation" that is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843-44. Absent eligibility for *Chevron* deference, agency interpretations are afforded only a degree of deference proportional to the agency's "power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see Perez v. Cuccinelli*, 949 F.3d 865, 877 (4th Cir. 2020). In applying this deference, "courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." *Perez*, 949 F.3d at 877-78 (quoting *Skidmore*, 323 U.S. at 228).

As to the regulation, USCIS points to 8 C.F.R. § 103.2(b)(1), which states that "[a]n applicant or petitioner must establish that he or she is eligible for the requested benefit at the time of filing the benefit request and must continue to be eligible through adjudication." 8 C.F.R. § 103.2(b)(1). This regulation, however, does not provide an answer to the present question because under Soumah's interpretation of § 1159(b)(3), eligibility for adjustment of status is firmly established if the applicant continued to be married to the refugee up to the date of application, such that the applicant would still "continue to be eligible through adjudication." *Id.*

As for BIA decisions, USCIS cites *Matter of T-C-A*, 28 I. & N. Dec. 472 (2022), in which the BIA addressed whether an applicant for adjustment of status to permanent residence, who had received derivative asylee status based on his father's asylum application, was no longer eligible for adjustment to permanent residence after his derivative asylee status was terminated because of his own criminal convictions. *Id.* at 473. In interpreting the part of the INA authorizing adjustment of the "status of any alien granted asylum," 8 U.S.C. § 1159(b), the BIA ruled that an applicant for adjustment of status is required "to possess asylee status at the time of adjustment," such that "an applicant whose asylee status has been terminated cannot adjust to lawful permanent resident status under this provision." *Id.* at 479. This decision, however, related to an individual whose asylee

15

status was terminated before he filed an application for adjustment of status and thus did not address the scenario presented here, where the applicant had the status in question at the time of application but lost it before USCIS finally adjudicated the application. *See id.* at 477. Indeed, while the United States Court of Appeals for the Fourth Circuit affirmed this BIA decision in *Cela v. Garland*, 75 F.4th 355 (4th Cir. 2023), and in doing so concluded that "§ 1159(b) unambiguously precludes an alien whose asylum status has been terminated from adjusting to lawful permanent resident status," it notably did not frame the issue as whether an applicant had to have asylee status at the time of adjustment, but instead focused on the fact that "Cela had no asylum status *at the time he applied* to become a lawful permanent resident" and concluded that "*at the time he applied* to adjust to lawful permanent resident status, Cela no longer held the status of 'alien granted asylum' from which he could adjust." *Id.* at 365 (emphasis added). Here, it is undisputed that Soumah had maintained asylee status through his ongoing marriage to his wife "at the time he applied" to adjust status. *Id.* Thus, the BIA's determination in *Matter of T-C-A*, as affirmed in *Cela*, did not address the issue presented here of whether Soumah's marital status needed to continue past the date of application in order for Soumah to be eligible for adjustment of status.

As for the other BIA and related agency rulings cited by USCIS, none address the statutory language in 8 U.S.C. § 1159(b)(3) and the question at issue here and thus do not warrant deference. *See Matter of P*, 4 I. & N. Dec. 610, 614 (A.G. 1952) (in a review by the Acting Attorney General of a BIA decision, addressing the validity of marriages and divorces occurring outside the United States for purposes of eligibility for an immigration benefit); *Matter of Khan*, 14 I. & N. Dec. 122, 124 (BIA 1972) (in considering a different provision of the INA, determining that a son's immigrant visa was not valid at the time of entry because it depended on the continued immigrant status of his father, which the BIA deemed to have terminated upon the father's death prior to the

entry, without addressing the impact of a change in status after an application but before adjudication); *Matter of Lew*, 11 I. & N. Dec. 148, 149-50 (1965) (denying first-preference classification for purposes of a quota-based visa provision under 8 U.S.C. § 1153 to a wife of a permanent resident because an interlocutory decree of divorce by default had been entered, without addressing the issue of whether an ongoing marriage as of the date of the filing of the application satisfied the statutory requirement).

To the extent that these BIA opinions, individually or collectively, could be construed as providing an interpretation of § 1159(b)(3) that a derivative asylee must continue to remain married after the date of application in order to remain eligible for adjustment of status, the Court finds, for the reasons stated above, that such an interpretation is unreasonable, arbitrary, and capricious in that it results in the decision on whether an applicant is eligible for adjustment of status to lawful permanent residence, and by extension for United States citizenship, turning on the arbitrary issue of when USCIS chooses to review and adjudicate the application. *See Amaya*, 986 F.3d at 432 (holding that the court need not give *Chevron* deference to a BIA interpretation that is "unreasonable" in that it is "arbitrary, capricious, or manifestly contrary to the statute").

Finally, while USCIS references a 1989 opinion of the agency general counsel and the USCIS policy manual, these sources do not meet the requirements for *Chevron* deference because they were not adopted "through either notice-and-comment rule-making, a formal adjudication, or some other means evincing an application of congressionally delegated authority to make rules carrying the force of law." *See Perez*, 949 F.3d at 877. Moreover, USCIS has not demonstrated that these sources sufficiently show "careful analysis" or "reliance on expertise" so as to warrant deference based on persuasiveness. *See id.* (declining to apply *Skidmore* deference to USCIS's interpretation of a statute for lack of careful analysis). In any event, for the reasons discussed

above, the Court finds that positions such as the USCIS policy manual's statement that "[a] derivative asylee must continue to meet the definition of a spouse or child of a refugee both at the time of filing and final adjudication of the adjustment application" are unreasonable, arbitrary, and capricious and thus declines to follow them. USCIS Policy Manual, Vol. 7, Part M, Ch. 2, subpart C, https://www.uscis.gov/policy-manual/volume-7-part-m-chapter-2 (last visited June 25, 2024).

For all of these reasons, the Court finds that 8 U.S.C. § 1159(b)(3) requires that a derivative asylee continue to married to the refugee spouse at the time of application in order to be eligible for adjustment of status to lawful permanent residence. Because it is undisputed that Soumah met this requirement, the Court finds no basis to dismiss the Complaint.

## CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Defendant's Motion to Dismiss, ECF No. 17, will be DENIED. A separate Order shall issue.

Date: June 26, 2024

THEODORE D. CHUANG
United States District Judge